UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

PEGGY SHUMPERT, INDIVIDUALLY, AND ON
BEHALF OF THE HEIRS AND WRONGFUL DEATH
BENEFICIARIES OF ANTWUN "RONNIE" SHUMPERT, SR.,
DECEASED AND CHARLES FOSTER                                    PLAINTIFFS

VS.                                               CAUSE NO. 1:16cv120-SA-DAS

CITY OF TUPELO, MISSISSIPPI,
MAYOR JASON SHELTON, IN HIS
OFFICIAL CAPACITY, CHIEF BART
AGUIRRE, IN HIS OFFICIAL CAPACITY,
OFFICER TYLER COOK, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES AND "JOHN
DOES" 1-10", ALL IN THEIR INDIVIDUAL
AND OFFICIAL CAPACITIES                                         DEFENDANTS

MEMORANDUM BRIEF IN SUPPORT OF SUMMARY JUDGMENT
MOTION OF THE CITY OF TUPELO, MISSISSIPPI, MAYOR JASON
SHELTON, IN HIS OFFICIAL CAPACITY, AND CHIEF BART AGUIRRE,
IN HIS OFFICIAL CAPACITY

## I. INTRODUCTION

The second amended complaint[1] [59] makes a number of allegations and asserts nine

counts, or causes of action, many of which are generic in nature as to the alleged at fault party,

and none of which can survive an analysis of the underlying facts to applicable law showing that

the City of Tupelo, Mayor Jason Shelton, in his official capacity, and Chief Bart Aguirre, in his

---

[1]    The second amended complaint is the last iteration of the plaintiffs' complaint, and is accordingly the pleading
to which reference will be made herein.

official capacity ("the Tupelo defendants") are entitled to judgment as a matter of law as to all claims.[2]

The plaintiffs allege the following causes of action:

1.  Constitutional violations pursuant to 42 U.S.C. §1983. The plaintiffs in Count I do not specify what constitutional violations are affected by the Tupelo defendants, and this is the only cause of action that alleges liability against the Tupelo defendants based on policy or custom.[3]

2.  Civil assault and battery. Claims of civil assault and battery related to Antwun Shumpert are asserted only against Tyler Cook individually. Claims of civil assault and battery related to Charles Foster are asserted against, "one or more of the defendants", presumably the unnamed John Doe defendants. The plaintiffs did not amend their complaint to identify these John Doe defendants.

3.  Violation of due process, equal dignity and equal protection. Paragraph 25 of the second amended complaint makes Fourteenth and Fourth Amendment claims of unspecified nature, with the remainder of Count III claiming Fourteenth Amendment violations of Shumpert's rights for failure to provide timely medical care.

4.  Excessive force. Plaintiffs allege violations of Shumpert's and Foster's Fourth Amendment protection against excessive force.

5.  Wrongful death.

6.  Injunctive relief.

7.  General negligence. These claims are asserted against Cook and the unnamed John Doe defendants in their individual capacities.

8.  Failure to properly hire, monitor, train and supervise the involved officers.

9.  Intentional or negligent infliction of emotional distress. While this cause of action is similarly pled vaguely, these claims seemingly must be asserted against Cook and the unnamed John Doe defendants in their individual capacities.

---

[2]   Officer Tyler Cook is sued in his individual and official capacities. The undersigned does not represent Officer Cook, but to the extent that the plaintiffs make claims against Cook in his official capacity, those claims are treated as claims against Tupelo. *See, Hafer v. Melo*, 502 U.S. 21, 25 (1991).

[3]   The Tupelo defendants assume that the plaintiffs intend to relate specific claims of constitutional violations back to the broad allegations in Count 1, and will respond accordingly.

2154117

Any state law claims sought to be asserted against the Tupelo defendants[4] fail as a matter of law pursuant to Miss. Code Ann. §11-46-9(1)(c). The Tupelo defendants will address those claims in summary fashion following a recitation of relevant facts and the standard of review.

The federal claims that the plaintiffs appear to assert against the Tupelo defendants therefore are as follows:

1.      Largely unidentified Fourteenth Amendment claims of both Shumpert and Foster, with the only specific Fourteenth Amendment claim being an allegation that Shumpert's Fourteenth Amendment rights were violated because of a delay in providing medical care for him.

2.      Largely unidentified Fourth Amendment claims of Shumpert and Foster. The Fourth Amendment claim as to Foster must arise from his detention by TPD officers after Shumpert fled. Any Fourth Amendment claim of Shumpert must arise from the actions of Officer Cook, and seemingly go hand in glove with the plaintiffs' Fourth Amendment excessive force claims against Cook.

3.      Fourth Amendment excessive force claims on behalf of Shumpert and Foster.

4.      Liability flowing from alleged failure to properly hire, monitor, train and supervise involved officers.

A review of each claim asserted by the plaintiffs shows that the Tupelo defendants are entitled to judgment as a matter of law.

## II. FACTUAL OVERVIEW

The Tupelo Police Department gathers information on criminal activity, and specifically where that criminal activity occurs. That information comes through the administrative offices of Major Anthony Hill and Captain Rusty Haynes. (Ex. "1", Dep. of Lt. Michael Russell, p. 56; Ex. "2", Dep. of TPD Assistant Chief Allan Gilbert, pp. 17-18). Information gathered by TPD, which comes from both crime statistics and citizen complaints, reflected that the Townhouse

---

[4]    These would appear to be Count II (civil assault and battery), Count VII (general negligence) and Count IX (intentional and/or negligent infliction of emotional distress).

2154117

Motel on South Gloster Street was a high crime area. Included in this information was the fact that at least one known narcotics dealer was thought to be operating out of the Townhouse Motel. (Ex. "1", Russell dep., p. 46; Ex. "3", Statement of Lt. Michael Russell, Bates Doc. T00023).[5]

This information was disseminated to TPD's Street Crimes Unit. (Ex. "4", Statement of Officer Joseph Senter, Bates Doc. T00019). Lt. Michael Russell of the Street Crimes Unit accordingly made a decision to engage in surveillance of the Townhouse Motel on the evening of June 18, 2016. (Ex. "1", Russell dep., pp. 46-47). Included in the surveillance team were Lt. Russell, Officer Joe Senter, Officer Jonathan Johnson and Officer Tyler Cook. (Ex. "1", Russell dep., p. 48; Ex. "5", Dep. of Officer Joseph Senter, p. 22; Ex. "6", Dep. of Officer Jonathan Johnson, p. 15).

The only member of the SCU surveillance team in a position to see activity ongoing at the Townhouse Motel would have been Lt. Russell, who was parked across the street from the Townhouse Motel in a used car lot. Lt. Russell says that he observed a vehicle, which was the vehicle now known to have been operated by Antwun Shumpert, enter the Townhouse Motel parking lot without stopping at the motel office and then exit approximately three minutes later. This activity is at least consistent with potential narcotics activity. (Ex. "1", Russell dep., pp. 49-50; Ex. "6", Johnson dep., pp. 45-46; Ex. "3", Russell Statement, Bates Doc. T00023).

Based on this observation, Lt. Russell radioed what he observed to Senter, Johnson and Cook. (Ex. "6", Johnson dep., p. 20; Ex. "4", Senter Statement, Bates Doc. T00019; Ex. "7", Statement of Officer Jonathan Johnson, Bates Doc. T00024). Lt. Russell also notified the surveillance team that the subject vehicle was headed north on South Gloster Street, which

---

[5] Bates numbered statements relied on herein are from the Mississippi Bureau of Investigation file produced during discovery.

would have been in the direction where Senter was located. (Ex. "1", Russell dep. pp. 49-51; Ex. "5", Senter dep., p. 31). Senter fell in behind the Shumpert vehicle as it turned west on Garfield Street from South Gloster. Senter testified that he noticed that the tag light was out on the vehicle, and as the vehicle approached the first intersection, it made a right hand turn without making a turn signal. (Ex. "5", Senter dep., pp. 31-32). Senter activated his blue lights and radioed that the vehicle was "slow rolling" him. (Ex. "4", Senter Statement, Bates Doc. T00019). The vehicle continued north on Van Buren (parallel to South Gloster) and continued to slow roll Senter, going through a three way stop without stopping. When the vehicle came to Harrison Street, the driver turned left to head west on Harrison Street. Shortly after turning onto Harrison Street, the driver of that vehicle stopped and Senter pulled in behind him. (Ex. "5", Senter dep., p. 33; Ex. "4", Senter Statement, Bates Doc. T00019).

Charles Foster testified that Shumpert advised him as he was slowing down to stop that he was going to make a run for it, and Foster asked him why and urged him not to do so. (Ex. "8", Dep. of Charles Foster, p. 34). Shumpert, however, gave no reason and did not heed Foster's advice. (Ex. "8", Foster dep., p. 35). As Senter got out of his car, Shumpert exited his vehicle. Senter instructed Shumpert to get back in the vehicle, but Shumpert instead ran around the front of the car and fled. Senter radioed that he "had one running" and began a pursuit of Shumpert. (Ex. "5", Senter dep., pp. 33-34, 56-58, 64; Ex. "4", Senter Statement, Bates Doc. T00019).

Foster says that he exited the Shumpert vehicle (which was in fact owned by Foster) and when a second officer arrived (Jonathan Johnson) Foster had his hands up. Johnson handcuffed Foster, placed him in Senter's car, and searched around the Shumpert vehicle to see if he could observe any weapons. (Ex. "6", Johnson dep. pp. 24-25; Ex. "8", Foster dep. pp. 36-37; Ex. "7",

Ex. "7", Johnson Statement, Bates Doc. T00019, T00024). Foster claims to have heard four gunshots, in rapid succession. (Ex. "8", Foster dep., pp. 39-40, 69-71). Foster was detained by TPD personnel, first by Johnson and then by a patrol officer who relieved Johnson, until the Mississippi Highway Patrol and Mississippi Bureau of Investigation took control of the crime scene, including the area where the Shumpert vehicle was stopped and where Foster was being detained. (Ex. "8", Foster dep., 41-43, 45-47). After Foster was turned over to the Mississippi Highway Patrol, he had no further involvement with TPD officers, ultimately being taken to the Lee County Detention Center by a Mississippi Highway Patrol officer. (Ex. "8", Foster dep., p. 47).

Senter pursued Shumpert, but soon lost contact with him. Senter gave a description of the suspect as wearing a maroon jersey with a No. 5 on it and shorts. (Ex. "5", Senter dep., p. 57; Ex. "9", Deposition of Officer Tyler Cook, p. 415). Patrol Officer Adam Merrill made contact with Senter in an area north of Harrison Street, behind the area where Cook ultimately encountered Shumpert, in a wooded area underneath a large power line. (Ex. "10", Dep. of Officer Adam Merrill, p. 23). Senter and Merrill were together when they heard gunshots fired in a rapid succession. (Ex. "5", Senter dep., pp. 67-68; Ex. "10", Merrill dep., pp. 23-25; Ex. "4", Senter Statement, Bates Doc. T00019; Ex. "11", Statement of Officer Adam Merrill, Bates Doc. T00026).[6]

Lt. Russell was also at this time searching for Shumpert, and was at the far end of Harrison Street when he also heard the gunshots fired in rapid succession, having stopped a

---

[6]     Three civilians, Michael Williams, Denise Miles and Brandon Robinson, were interviewed by the Mississippi Bureau of Investigation and each confirmed that they heard multiple gunshots in rapid succession, with no pause between the shots. (Ex. "13", Report of interview of Michael Williams, Bates Doc. T00028; Ex. "14", Report of interview of Denise Miles, Bates Doc. T00030; Ex. "15", Report of interview of Brandon Robinson, Bates Doc. T00036).

civilian who was about to travel down Harrison Street. (Ex. "1", Russell dep., p. 56; Ex. "3", Russell Statement, Bates Doc. T00023).

Officer Cook and his K9 officer, Alec, had responded to Senter's call and Alec led Cook to the back of a house on Harrison Street where Cook saw an individual holding the door to a crawlspace closed with his hand. (Ex. "9", Cook dep., pp. 89-90; Ex. "12", Statement of Officer Tyler Cook, Bates Doc. T00021). The back yard was pitch black, with the only illumination being the small flashlight on Cook's service weapon. (Ex. "9", Cook dep., pp. 90, 112).

Cook drew his service weapon and opened the crawlspace door, and observed that the individual was wearing a maroon jersey with a No. 5 on it. (Ex. "9", Cook dep., pp. 90, 163, 419-20; Ex. "12", Cook Statement, Bates Doc. T00021).[7] Cook announced to Shumpert that he was a TPD officer, that he had a dog, advising him to come out and surrender and finally advising him that the dog would bite. (Ex. "9", Cook dep., pp. 90, 93-94; Ex. "12", Cook Statement, Bates Doc. T00021).

In response to this Shumpert fled several feet back into the crawlspace of the house. (Ex. "9", Cook dep., pp. 104-07, 164, 348-49; Ex. "12", Cook Statement, Bates Doc. T00021-22). Cook did not know whether Shumpert was armed, did not know whether the house was occupied, did not know whether Shumpert could access the interior of the house from the crawlspace and did not know whether there were other exits from the crawlspace. (Ex. "9", Cook dep., pp. 123-24, 149-51, 171, 285-86). Cook thereupon gave Alec the order to engage and released him. Shumpert beat Alec off and removed his jersey, with which Alec apparently was engaged. (Ex. "9", Cook dep., pp. 96-98). After removing his jersey, Shumpert came out of the crawlspace and tackled Cook, getting on top of him. (Ex. "9", Cook dep., pp. 99-100). Shumpert started beating Cook around the face and Cook fought back to the best of his ability.

---

[7]   This individual was later identified to be Antwun Shumpert.

2154117

(Ex. "9", Cook dep., pp. 102, 108-113). Cook started to see stars and feared that he would lose consciousness, and being concerned about what would happen if he lost consciousness fired several times in rapid succession. (Ex. "9", Cook dep., pp. 113-14, 120; Ex. "12", Cook Statement, Bates Doc. T00022).

Senter and Merrill heard the gunshots, and ran in the direction of the gunshots, arriving in the back yard of the residence where the incident occurred approximately a minute after hearing the gunshots. (Ex. "5", Senter dep., pp. 67-68, 86; Ex. "4", Senter Statement, Bates Doc. T00019; Ex. "10", Merrill dep., pp. 25-26). Russell also heard the gunshots, and after advising the civilians that he was engaged with at the far end of Harrison Street to stay put, started toward the gunshot sounds. (Ex. "1", Russell dep., pp. 56-57). The senior patrol sergeant on duty that night, Tiffany Gilleylen, heard a radio call that shots had been fired with an approximate address, and started in that direction from West Main Street. (Ex. "16", Dep. of Sgt. Tiffany Gilleylen, pp. 33-34).

Senter and Merrill were the first officers at the scene after the shooting, with Senter going first to Shumpert, who was lying on the ground and bloody, and Merrill going to check on Cook, who was at or near the house restraining Alec. (Ex. "5", Senter dep., p. 74; Ex. "10", Merrill dep., pp. 28-39; Ex. "11", Merrill Statement, Bates Doc. T00026).

Merrill says that Cook's face was red, somewhat bloated and it appeared that he had been struck in the face. (Ex. "10", Merrill dep., pp. 31-32, 34, 50, 62; Ex. "11", Merrill Statement, Bates Doc. T00026). Senter verifies Merrill's statement to that effect. (Ex. "5", Senter Dep., p. 118; Ex. "4", Senter Statement, Bates Doc. T00019). Senter handcuffed Shumpert (Ex. "5", Senter dep., p. 20) and after checking on Cook, Merrill went to the front of the house to get a precise address. (Ex. "5", Senter dep., p. 92; Ex. "11", Merrill Statement, Bates Doc. T00026).

8

During this same time, a call was placed to E-911 to request that an ambulance be dispatched for Shumpert. (Ex. "5", Senter dep., p. 86; Ex. "12", Cook Statement, Bates Doc. T00022).

A couple of minutes after the shooting Sgt. Gilleylen arrived. She first checked on Cook, giving a description of his appearance substantially similar to that given by Merrill and Senter, noting that his face was bruised. (Ex. "16", Gilleylen dep., pp. 40-42). Russell too observed Cook, and he also verified Cook's condition. (Ex. "1", Russell dep. 59, 81-82). Sgt. Gilleylen says that after she had checked on Cook, she started toward Shumpert and Senter, and testified that Shumpert was moving around and being uncooperative. Sgt. Gilleylen stated, as did Officer Senter, that she did not observe Shumpert bleeding from a wound and that it would have been very difficult to have provided first aid to Shumpert because of his actions. (Ex. "16", Gilleylen dep., pp. 53-55, 57; Ex. "5", Senter dep., pp. 78, 81-82, 84, 116).

Sgt. Gilleylen testified that EMS personnel arrived almost immediately after she first checked on Shumpert (Ex. "16", Gilleylen dep., pp. 48, 51), and Merrill testified that EMS personnel arrived at the scene to provide aid to Shumpert in less than five minutes. (Ex. "10", Merrill dep., p. 31). Upon the arrival of EMS personnel, Sgt. Gilleylen asked if they wanted Shumpert's handcuffs removed, and they stated that they did as long as he cooperated. EMS personnel then took over and transported Shumpert to North Mississippi Medical Center. (Ex. "16", Gilleylen dep., pp. 54-55).

Sgt. Gilleylen called TPD Patrol Captain Tim Bell, and Bell, who was off duty and at his residence, came immediately to the scene. (Ex. "17", Dep. of Captain Tim Bell, pp. 59-60). Captain Bell says that he arrived somewhere between fifteen to twenty minutes after receiving Sgt. Gilleylen's call, and when he arrived he observed crime scene tape. (Ex. "17", Bell dep., p. 60). Captain Bell stated that he first saw Lt. Russell and Officer Cook, and was concerned

enough about Cook's status that he called 911 for an ambulance to be sent for Cook. (Ex. "17", Bell dep., pp. 61-63, 65-67).

Captain Bell and Sgt. Gilleylen walked to the back of the yard where Captain Bell observed the scene. However, neither he nor any other TPD personnel did anything with the evidence at the scene, waiting for either TPD detectives and ultimately the Mississippi Highway Patrol and Mississippi Bureau of Investigation personnel to arrive. (Ex. "17", Bell dep., pp. 107-110). Captain Bell says that TPD personnel stayed on the scene for another twenty minutes or so, until the Mississippi Highway Patrol and the Mississippi Bureau of Investigation personnel arrived, at which time TPD turned the scene over to the Mississippi Highway Patrol and Mississippi Bureau of Investigation (Ex. "17", Bell dep., p. 113).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." 477 U.S. at 323. The non-moving party must then "go beyond the pleadings" and set forth "specific facts showing there is a genuine issue for trial." *Id.* at 324. In reviewing the evidence, factual controversies are

2154117

to be resolved in favor of the non-movant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgewick James of WA,* 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997).

## IV. ARGUMENT AND AUTHORITIES

### A.  General Municipal Liability

#### 1.  "Official Capacity" Claims are Duplicative of Plaintiffs' Claims Against Tupelo

The plaintiffs have sued Mayor Jason Shelton and Chief Bart Aguirre in their official capacities as Mayor and Chief of Police of the City of Tupelo.[8] These "official capacity" claims are just another way to plead against the governmental entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("an official-capacity suit is, in all respects other than names, to be treated as a suit against the entity"). Official capacity claims are "*not* a suit against the official personally, for the real party in interest is the entity." *Id.* (emphasis in original). A plaintiff seeking relief based on official capacity claims must look to the governmental entity for the relief sought. *Id. See also*, *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 (1978). The City of Tupelo is a named defendant in this case. The plaintiffs' official capacity claims against Mayor Shelton and Chief Aguirre, as well as against Officer Tyler Cook, are merely duplicative, and should be dismissed. *Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (holding dismissal of official capacity claims proper because they duplicate claims made against governmental entity); *see also*, *Parker v. Tyson Foods, Inc.,* 2007 WL 2021928 (S.D. Miss.

---

[8]  The plaintiffs have also sued Officer Tyler Cook in his official capacity, as well as suing him individually.

2007) ("since the plaintiff also names the employer [ ] as a defendant, any Title VII claims against Shewmaker in his official capacity would be merely repetitive").

### 2.    State Law Claims

The plaintiffs seemingly make three state law claims in the second amended complaint [59]:  civil assault and battery, general negligence and intentional and/or negligent infliction of emotional distress.  All state law claims are barred by Miss. Code Ann. §11-46-9(1)(c), which reads as follows:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities related to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

*Id.*

As to any state law claims of the estate and heirs of Antwun Shumpert, it is crystal clear that Shumpert was engaged in criminal activity at the time of his injuries.  He failed and refused to comply with a series of lawful orders from law enforcement officers, resisted arrest, broke into and entered a private dwelling and assaulted a police officer.  Any state law claims by the estate or heirs of Shumpert are accordingly subject to and should be summarily dismissed as being statutorily barred.

As to Foster, he makes no claim approaching a reckless disregard for his safety and well-being by any TPD officer.  He was detained by TPD officers pending the arrival of Mississippi Highway Patrol and Mississippi Bureau of Investigation officials, for what appears to be approximately 45 minutes, after Shumpert fled and engaged in the activity that led to his being shot while assaulting Officer Cook.  Actions of TPD officers to detain him for this short period

of time fail to establish a reckless disregard for Foster's safety and well-being, and his state law claims also according fail.

### 3. Federal Constitutional Claims

The plaintiffs' claims against the Tupelo defendants must stem from actions of involved TPD officers, who have been identified as Officer Tyler Cook, Officer Joe Senter, Officer Jonathan Johnson, Officer Adam Merrill and Officer Tiffany Gilleylen.[9] The law is well established, however, that a governmental entity is not liable under 28 U.S.C. §1983 on the theory of respondeat superior for the alleged acts or omissions of its employees. *See*, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dept. of Soc. Services,* 436 U.S. 658, 694 (1978); *Johnson v. Deep East Texas Reg'l. Narcotics Trafficking Task Force*, 379 F.3d 293, 308 (5th Cir. 2004); *Whitt v. Stephens County,* 529 F.3d 278, 283-84 (5th Cir. 2008). "A municipality can be found liable under §1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under §1983." *City of Canton*, 489 U.S. at 385 (citing *Monell v. New York City Dept. of Soc. Services,* 436 U.S. 658, 694-95 (1978)). "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §1983." *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987).

A municipality is almost never liable for an isolated unconstitutional act on the part of the employee; it is liable only for acts directly attributable to it through "some official action or imprimatur." *Peterson v. City of Ft. Worth*, 588 F.3d 838, 847-48 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 568 (5th Cir. 2001)). To establish municipal liability under §1983, a plaintiff must show that (1) an official policy, (2) promulgated by the

---

[9] Officers Senter, Johnson, Merrill and Gilleylen would presumably have been the unnamed John Doe defendants who were not added as parties to this lawsuit.

municipal policy maker, (3) was the moving force behind the violation of the constitutional right. *Piotrowski*, 237 F.3d at 568 (citing *Monell*, 436 U.S. at 694). The plaintiff "must generally demonstrate at least a pattern of similar violations that caused a violation of constitutional rights." *Pernell v. City of Columbus*, 2010 WL 1737639 *5 (N.D. Miss. 2010) (quoting *Thompson v. Upshur Co., Texas*, 245 F.3d 447, 449 (5th Cir. 2001)). An isolated incident is not sufficient to show that a policy or custom exists. *Id.* (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984)). The policy must be "persistent, widespread, common, and well-settled." *Brown v. Callahan*, 623 F.3d 249, 256 (5th Cir. 2010).

The Fifth Circuit has defined "official policy" as:

(1)     a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

(2)     a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents a municipal policy. "Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy."

*Mason v. Lafayette City-Parish Consolidated Government,* 806 F.3d 268, 279-82 (5th Cir. 2015) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir. 1984)).

A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policy making authority' over the subject matter of the pending policy." *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989). Therefore, the plaintiff must show that the policy was promulgated by the municipality's policy maker.

As the court in *Mason* explained, the "moving force" prong requires the plaintiff to make two showings: causation and culpability. *Mason*, 806 F.3d at 280 (citing *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997)). A plaintiff must show a "direct causal

14

connection . . . between the policy and the alleged constitutional deprivation." *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1982)). "The 'moving force' inquiry imposes a causation standard higher than 'but for' causation." *Id.* "Under the culpability requirement, if the policy is facially lawful, a plaintiff must also show that the municipality 'promulgated [the policy] with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result.'" *Id.* (citing *Piotrowski v. City of Houston*, 237 F.3d at 567, 569)). Even a showing of heightened negligence is insufficient to show the deliberate indifference needed to prove municipal liability. *Piotrowski*, 237 F.3d at 529 (citing *Brown*, 520 U.S. at 407).

The plaintiffs cite to no policy statement, ordinance, regulation or decision that was officially adopted and promulgated by Tupelo's lawmaking officers that they claim is unconstitutional and was a moving force behind the violation of any of the plaintiffs' rights. The plaintiffs' chief complaints as reflected through the course of discovery focus on alleged failures of specific individual TPD officers to have followed adopted municipal policies, which clearly are facially constitutional.[10] This falls far short of the requirements to assess liability against Tupelo as there is no proof of anything done by its policy makers, much less any actions perpetrated with deliberate indifference, resulting in a violation of the plaintiffs' constitutional rights. And as will be shown hereinbelow as to each specific claimed constitutional violation, there is no evidence of a persistent, widespread practice by City officials or employees that is so common and well settled to constitute a custom that fairly represents municipal policy being the "moving force" behind any alleged violation of the plaintiffs' constitutional rights.

The plaintiffs' claims of constitutional violations as to the Tupelo defendants fail completely.

---

[10]   Tupelo produced the following TPD Standard Operating Procedures from which various deponents were questioned:  Canine Operations, Patrol Operations, Arrest Procedures, Response to Resistance and Constitutional Civil Rights, Exhibits 20, 21, 22, 23 and 24.

2154117

**B.       Specific Federal Claims**

It is axiomatic that in order for the plaintiffs to state a claim against the Tupelo defendants for violation of any constitutional right of Shumpert or Foster they must first prove that a constitutional right was in fact violated.  They must then show that an official policy, as defined by the Fifth Circuit, promulgated by the municipal policy maker was the moving force behind the violation of the constitutional right.  *See, infra.*  As will be noted hereinbelow, the plaintiffs cannot show that a constitutional right of either Shumpert or Foster was violated, much less that an official policy of the City of Tupelo promulgated by the municipal policy maker was the moving force behind a violation of the constitutional right.

**1.       Shumpert's Fourteenth Amendment Claim -- Medical Care**

The plaintiffs' claim that the defendants violated Shumpert's Fourteenth Amendment rights by acting with deliberate indifference by failing to render aid to Shumpert after the shooting.

In *Mason v. Lafayette City--Parish Consolidated Government*, 806 F.3d 268 (5ᵗʰ Cir. 2015) the United States Court of Appeals for the Fifth Circuit articulated the plaintiff's burden in proving a Fourteenth Amendment violation to render medical care as follows:

> "The *Due Process Clause* . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."  (citing *Revere v. Mass. General Hosp.*, 463 U.S. 239, 244 (1983).  "[T]he plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference."  (citing *Hill v. Carroll Co.*, 587 F.3d 230, 238 (5ᵗʰ Cir. 2009).  Deliberate indifference is "an extremely high standard to meet." (citing *United States v. Gonzalez,* 436 F.3d 560, 574-75 (5ᵗʰ Cir. 2006).  A plaintiff "must show that the officials 'refuse to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" (citing *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5ᵗʰ Cir. 2001).

16

806 F.3d at 279.

The plaintiffs claim that Officer Cook did not immediately call for an ambulance after the shooting and allowed K9 Alec to mutilate Shumpert. [59, ¶27]. But the proof is crystal clear that a call was placed to 911 almost immediately to request that an ambulance be dispatched for Shumpert, and that the ambulance arrived in less than five minutes following the shooting. *Infra* at 8-9. Further, there is absolutely no evidence that Shumpert was "mutilated" by K9 Alec.

Officers Senter and Merrill arrived at the scene of the incident within approximately a minute of the shooting, with Senter going almost immediately to Shumpert. *Infra* at 7-8. Within another minute or two, Sgt. Gilleylen arrived, and she too went to Shumpert after first checking on Cook. Both Senter and Gilleylen testified that they were trained in first aid, but were aware that EMS personnel would arrive imminently, noted that while Shumpert was bloody he was not bleeding from an apparent wound such that pressure needed to be applied and that it would have been difficult to provide first aid to him because he was moving around and being uncooperative. *Infra* at 8-9.

Similar to the law enforcement officer engaged in *Mason*, whose actions the court found not to be violative of the plaintiff's Fourteenth Amendment rights, the actions of Cook in restraining K9 Alec and deferring to other officers to attend Shumpert cannot fairly be described as showing a wanton disregard for Shumpert's serious medical needs. 806 F.3d at 279. As to the actions of either Senter, Gilleylen and Merrill (the other officers identified as being on the scene prior to the arrival of EMS personnel), there is no evidence that anything done or not done by any of these officers showed a deliberate indifference or evinces a wanton disregard for Shumpert's medical needs. While they were each trained in first aid and knew to apply pressure to a bleed, none identified a specific wound that needed attention, Shumpert was being

17

2154117

uncooperative and each knew that EMS personnel would arrive imminently. Senter and Gilleylen testified that they assured Shumpert that medical care would be arriving in a moment and urged him to remain calm and be cooperative. *Infra* at 8-9.

As to any claim that Shumpert's Fourteenth Amendment rights were violated by the failure to provide medical care to Shumpert as it pertains to the Tupelo defendants, discovery showed that each involved officer was properly trained in first aid. *Infra* at 8-9. Further, the plaintiffs can point to no official policy of the City of Tupelo that is the moving force behind any alleged violation of Shumpert's constitutional rights in this respect. Indeed, the Standard Operating Procedures marked as Exhibits 20-24 are replete with references to the appropriate application of medical care. Further, the plaintiffs can cite to no persistent widespread practice of TPD officers failing to provide timely and effective medical care to a suspect. In fact, they can cite to no other incidents.

The plaintiffs' claims that Shumpert's Fourteenth Amendment rights were violated by the failure of TPD officers to provide timely medical care is at best an acute incident related to the events of June 18, 2016, and there is no evidence to support such a claim. There simply is no basis whatsoever to impose municipal liability in that respect.

### 2. Foster's Fourth Amendment Detention Claim.

The plaintiffs make an unarticulated Fourth Amendment search and seizure claim on behalf of Foster. [59, ¶25]. Foster was detained after Shumpert fled for what appears to be approximately 45 minutes, until the scene was turned over to the control of Mississippi Highway Patrol and Mississippi Bureau of Investigation officers. *Infra* at 5-6. This brief detention should be analyzed under *Terry v. Ohio*, 392 U.S. 1 (1968).

The Tupelo defendants recognize that "warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993). A *Terry* stop is one of those exceptions. *Terry* provides that law enforcement officers may briefly detain an individual, despite a lack of probable cause to arrest, when they have an objectively reasonable suspicion that criminal activity is afoot. *United States v. Baker*, 47 F.3d 691, 693 (5th Cir. 1995). As noted in *Terry*, "[A] police officer may approach an individual for purposes of investigating possible criminal behavior, even in the absence of probable cause to arrest." 392 U.S. at 22. The reasonable suspicion supporting a detention must be based on "specific and articulable facts and rational inferences that justify the intrusion." *United States v. Abdo*, 773 F.3d 562, 565 (5th Cir. 2003). "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one -- whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.

As noted *infra*, Foster first encountered TPD Officer Jonathan Johnson after Shumpert fled a routine traffic stop. The information then available to Johnson was that the occupants of the vehicle in which Foster was a guest passenger had engaged in activity a few moments prior to the stop at a motel that was under surveillance for known criminal activity, and the actions of the vehicle occupants were at least consistent with potential narcotics activity. This information had been relayed by TPD Lt. Michael Russell to the other members of the surveillance team, which included Officer Johnson. *Infra* at 4. Upon encountering Foster therefore, Johnson was aware that Foster had engaged in activity that was at least suspicious of a potential narcotics transaction and the driver of the vehicle in which Foster was traveling had for unknown reasons

2154117

fled from a routine traffic stop. *Infra* at 5. There was accordingly grounds for Johnson to have a reasonable suspicion to believe that the occupants of that vehicle, Shumpert and Foster, were engaged in criminal activity. Johnson accordingly secured Foster by placing him in handcuffs, putting him in Senter's vehicle, and searching around the Shumpert/Foster vehicle for weapons. *Infra.* at 5-6.

The suspicion that Shumpert and Foster were engaged in criminal activity was heightened by the shooting that occurred shortly thereafter.

The court in *Terry* noted that detention is justified when, under the totality of the circumstances, law enforcement officials can point to facts giving rise to a "reasonable suspicion" that the person stopped and detained is committing or has committed a crime. *Terry*, 392 U.S. at 21. The Supreme Court noted further that "reasonable suspicion" is a quantum of evidence, just like "preponderance of the evidence," or "beyond a reasonable doubt." And the Court has noted further that it is likely the lowest quantum of evidence that the law will recognize for any purpose. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

The Fifth Circuit employs a two-part test to determine whether there was reasonable suspicion during a *Terry* stop: (1) whether the officer's action was justified in its inception, and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014).

Foster was detained by TPD officers at a time starting shortly after Shumpert fled from the routine traffic stop until MBI and Mississippi Highway Patrol officers arrived at the scene approximately 45 minutes later to take control of the crime scene. *See infra.* at 5-6. Officer Johnson was clearly justified in detaining Foster under the suspicious circumstances of the actions of the occupants of the Foster/Shumpert vehicle and Shumpert's subsequent actions in

fleeing from a routine traffic stop. And similarly, Johnson and subsequent TPD officers were justified in detaining Foster following a shooting involving a TPD officer until the investigating authorities (the Mississippi Bureau of Investigation and Mississippi Highway Patrol) arrived at the scene. The actions of the individual TPD officers did not violate Foster's Fourth Amendment rights.

Further to the point in regard to any claim that a Fourth Amendment violation of Foster's rights for his detention by TPD officers rises to the level of municipal liability, the plaintiffs can point to no official policy of the City of Tupelo that is the moving force behind a claimed violation of Foster's Fourth Amendment rights, and can cite to no persistent widespread practices of TPD officers wrongfully detaining individuals in violation of *Terry*. In fact, the plaintiffs can cite to no instance of an improper *Terry* detention by TPD officers. There accordingly is no basis to impose municipal liability in regard to Foster's detention by TPD personnel.

### 3. Fourth Amendment Excessive Force Claims.

In *Vann v. City of Southaven*, 199 F.Supp. 3d 1129 (N.D. 2016), this Court noted as follows in regard to a Fourth Amendment excessive force claim:

> To establish a *Fourth Amendment* violation based on allegations of excessive force, a plaintiff must prove: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012). In *Graham v. Connor*, 490 U.S. 386, 396 (1989), the U. S. Supreme Court stated that the relevant factors for consideration on an excessive force claim include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight."

*Vann*, 199 F.Supp. at 1135.

2154117

The *Vann* court noted further that,

> The Supreme Court has emphasized that "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness in these circumstances must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation." *Id.* at 396-397. This court believes that the Supreme Court had cases such as this one in mind when it wrote these words. That being the case, it seems quite improper for this court to do anything but give a great deal of deference to the split-second decisions which Detective Logan was forced to make when confronted with the chaotic events of this case.

*Vann*, 199 F.Supp. at 1143.

While the plaintiffs seemingly make Fourth Amendment excessive force claims on behalf of Foster, it is difficult to believe they are serious in that respect. Foster was detained for what appears to be something in the range of 45 minutes, handcuffed and placed in the back of a police vehicle until being turned over to the Mississippi Highway Patrol. *Infra* at 5-6. While in his deposition Foster complains that the handcuffs were too tight (Ex. "8", Foster dep., p. 45), he claims no other injury claim and no one would reasonably argue that placing someone in handcuffs amounts to a use of force that is clearly excessive and the excessiveness of which is clearly unreasonable.

As to the plaintiffs' claims that Officer Cook's actions in his encounter with Shumpert were a Fourth Amendment violation of Shumpert's rights because of excessive force on Cook's behalf, a review of the underlying facts shows a remarkable consistency with those noted by the court in *Vann*.

Prior to encountering Shumpert, Cook was aware that Shumpert had been engaged in activity that appeared suspicious of a narcotics transaction and that immediately after engaging

2154117

in that action he had fled from a routine traffic stop.  *Infra* at 4-5.  In response to a fellow officer's call, Cook and his K9 officer found Shumpert trying to hide in the crawlspace of a residence on Harrison Street.  The circumstances confronting Cook were that it was pitch black behind the residence with the only illumination coming from a small flashlight on Cook's service weapon, with Cook not knowing whether Shumpert was armed, not knowing whether the house was occupied, not knowing whether Shumpert could access the interior of the house from the crawlspace and not knowing whether there were other exits from the crawlspace.  *Infra* at 6-7.

Faced with these set of circumstances, Cook drew his service weapon and opened the crawlspace door, where he observed an individual matching the description given by Officer Senter of the suspect.  Cook thereupon announced to Shumpert that he was a TPD officer, that he had a dog, advising him to come out and surrender and finally advising that the dog would bite. *Infra* at 6-7.

Rather than comply with Cook's command, Shumpert fled several feet back into the crawlspace of the house.  Cook thereupon gave K9 Alec the order to engage and released him.  Shumpert beat Alec off and removed his jersey, with which Alec apparently was engaged.  After removing his jersey, Shumpert came out of the crawlspace and tackled Cook, getting on top of him.  Shumpert started beating Cook around the face and Cook fought back to the best of his ability.  Cook started to see stars and it appeared that he would lose consciousness, and being concerned about what would happen if he lost consciousness fired several times in rapid succession.  *Infra* at 7.

Just as the officers involved in *Vann,* and as noted by the United States Supreme Court in *Graham*, Cook was forced to make a split-second judgment in circumstances that were tense, uncertain and rapidly evolving about the amount of force that was necessary in that particular

23

situation. Cook's actions cannot be seen under existing circumstances to be a use of force that was clearly excessive, the excessiveness of which was clearly unreasonable.

And as with each of the other specific claims of constitutional violations, the plaintiffs can point to no official policy of the City of Tupelo that is the moving force behind any alleged excessive force vis-a-vis Shumpert. Further, the plaintiffs can cite to no persistent widespread practice of TPD officers engaging in acts of excessive force.

Between 2013 and 2016, the Tupelo Police Department responded to 371,724 calls to service. *See,* Ex. "18", Affidavit of Deputy Chief Allan Gilbert. In response to interrogatories propounded by the plaintiffs seeking the identity of all claims in which TPD officers were alleged to have used excessive force, TPD identified five such claims, three of which were found to be unwarranted. The two that were found to be valid resulted in termination of employment of the involved TPD officer. *See,* Ex. "19", Response to Plaintiffs' Interrogatory No. 22.

The Fifth Circuit undertook a thorough analysis of the course of conduct required to establish a custom or practice of condoning excessive force in *Peterson v. City of Ft. Worth*, 588 F.3d 838, 850-52 (5th Cir. 2009). In *Peterson*, the court analyzed the record of twenty-seven instances of alleged excessive force by the Ft. Worth Police Department over a three year period. And while the Tupelo defendants recognize that Ft. Worth is a larger community than Tupelo, a record of five allegations of excessive force, two of which were found to be valid and which resulted in the termination of involved officers, over a five year period in a municipality that responds to nearly 100,000 calls to service annually, falls far, far short of a practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy of condoning excessive force. To the contrary, it shows a practice and custom of sporadic claims of excessive force, none of which are condoned.

24

The plaintiffs' excessive force claims against the Tupelo defendants, like their other constitutional claims, fail.

### 4. Failure to Properly Hire, Monitor, Train and Supervise.

Count VIII of the Second Amended Complaint makes claims of failure in hiring and to monitor, train and supervise involved officers. [59, ¶40-43]. This claim however, is general in nature[11] and fails to specify what training was needed and why or how any such training provided by Tupelo was deficient.

To establish a municipality's failure to train, a plaintiff must show "(1) inadequate training procedures; (2) that inadequate training caused the task force officer's to [use excessive force]; and (3) the deliberate indifference of municipal policy makers." *Quinn v. Guerrero*, 2017 U.S. App. LEXIS, 12290, 23-24 (5th Cir. 2017) (citing *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002)). "The inadequacy of [the] training must be closely related to the injury." *Id.* Defects in a particular training program must be alleged specifically. *Roberts v. City of Shreveport*, 397 F.3d 287, 298 (5th Cir. 2005). *See also*, *Zimmerman v. Cutler*, 657 Fed. Appx. 340, 347-48 (5th Cir. 2016) (dismissing plaintiff's failure to train cause of action because the plaintiff "failed to adduce any evidence of Department training procedures -- inadequate or otherwise.")

Any claim based on a failure in hiring practices, or to monitor, train and supervisor the involved officers fails for any number of reasons. First is that for all of the reasons noted *infra*, the plaintiffs fail to state a claim of any kind or nature based on the actions of involved TPD officers. Going further, the plaintiffs fail to articulate what training was not provided to the involved officers or how any prescribed training resulted in a constitutional deprivation of either

---

[11] Indeed, this appears to be a canned allegation, as paragraph 41 of the Second Amended Complaint alleges improper actions pertinent to the arrest of Michael McDougal, Sr., who is a stranger to this lawsuit. [59, ¶41].

Shumpert's or Foster's rights, much less that Tupelo was deliberately indifferent in regard to training protocol.

The plaintiffs will surely point out that one of the qualifications of a canine handler delineated in TPD's Canine Operations policies and procedures is that the officer must have at least three years' patrol experience with TPD (*see*, Exhibit 20, Canine Operations, Bates Doc. T000660), and Cook evidently had been with TPD between one to two years when made a canine handler. However, Cook was made a canine officer approximately three years prior to the incident involving Shumpert, had performed without incident prior to June 18, 2016 and the transfer of him to the K9 Unit took into consideration his canine military experience and accordingly was well within the discretion of the TPD Chief of Police to vary from stated qualifications. (Ex. "2", Gilbert dep., p. 29).

There is absolutely no evidence that either Officer Cook or any of the involved TPD officers were inadequately trained -- none whatsoever. While TPD Chief Aguirre did exercise discretion in waiving one of the six qualifications of a canine handler in transferring Officer Cook to that position, there is absolutely no evidence that on the evening of June 18, 2016 that Cook was not fully qualified and well trained. There is no basis for a claim against the Tupelo defendants in this regard.

**5.** *Vann v. The City of Southaven.*

As noted earlier, the recent decision by this Court in *Vann v. City of Southaven*, 119 F.Supp. 3d 1129 (N.D. MS 2016) involves an analysis of facts to controlling law that is almost in point to the case at bar. Similar to this case, the plaintiff's decedent in *Vann* was shot and killed by law enforcement officers while attempting to escape arrest. The court in *Vann* applied the underlying facts to controlling legal authority and granted the individual officers' qualified

26

immunity motions and the municipal defendant's summary judgment motion, and in so doing made the following commentary:

> Even disregarding the emergency situation facing Detective Logan, it is not at all clear to this court, even now, that he did anything other than his job duties required. It strikes this court that the natural inclination of good police officers, when they are faced with clearly unlawful conduct taking place before them, is to make an arrest. Plaintiff appears to contend that Logan should have essentially yielded to force and allowed Vann to make his escape once he escalated the situation by violently resisting arrest with a deadly weapon, namely his car. In the court's view, however, the orderly and efficient enforcement of the law allows officers to reasonably presume that suspects will obey lawful orders to halt. It further seems likely that, if criminals came to believe that police officers would simply let them escape if they violently resisted arrest, that there would be many more suspects crashing their vehicles against police cars rather than quietly submitting to arrest. This court therefore does not regard the actions of the police officers in this case as being unreasonable, even when those actions are considered after the fact, in the calm of the judicial chambers.

*Vann*, 119 F.Supp. at 1143.

Similarly, Cook was simply trying to arrest a suspect who had potentially been involved in a narcotics transaction, who had fled from a routine traffic stop, who broke and entered into the crawlspace of a private residence and who then assaulted Cook. Similar to the plaintiff's arguments in *Vann*, the plaintiffs here seemingly contend that Cook should have allowed Shumpert to escape and/or allowed himself to have been rendered unconscious upon being assaulted by Shumpert -- leaving himself to Shumpert's mercy in that event. The Tupelo defendants submit respectfully that just as the *Vann* court found the involved officers not to have used excessive force in their encounter with the plaintiff's decedent, neither did Cook in his encounter with Shumpert.

The Court in *Vann* then went on to analyze potential municipal liability noting that, "Congress did not intend municipalities to be held liable unless action pursuant to official

2154117

municipal policy of some nature caused a constitutional tort." (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). The court in *Vann* noted further that policies that are not ideal do not make them unconstitutional and, similarly, that a city's failure to follow policy is not fatal. The court stated that, "Allegations that a city adopted beneficial policies but has failed to follow them sound in simple negligence, not the sort of 'deliberate indifference' required to establish municipal liability." *Id.* at 1148.

The facts of this case are a remarkable similarity to those in *Vann*, and the result should be the same -- summary dismissal of all claims against all defendants.

## V. CONCLUSION

On the evening of June 18, 2016, Antwun Shumpert made a series of poor decisions that unfortunately led to his death. In response to a routine traffic stop, he fled from his vehicle and sought to avoid arrest by TPD officers. He broke into a private residence, and when finally located in the crawlspace of that residence, instead of surrendering he chose to assault TPD Officer Tyler Cook. The response of none of the involved TPD officers, either with Shumpert or at the vehicle with Charles Foster, violated a constitutional right of either Shumpert or Foster.

The Tupelo defendants submit that the facts and law make it clear that the Tupelo defendants are entitled to a judgment in their favor as a matter of law as to all claims or causes of action asserted by the plaintiffs.

28

2154117

Dated:  August 18, 2017.

        CITY OF TUPELO, MISSISSIPPI,
        MAYOR JASON SHELTON, IN HIS
        OFFICIAL CAPACITY, CHIEF BART
        AGUIRRE, IN HIS OFFICIAL
        CAPACITY, DEFENDANTS


BY: */s/John S. Hill*
      JOHN S. HILL, MB# 2451
      BERKLEY N. HUSKISON, MB# 9582


OF COUNSEL:

MITCHELL, McNUTT & SAMS, P.A.
POST OFFICE BOX 7120
105 SOUTH FRONT STREET
TUPELO, MS  38802-7120
TELEPHONE: (662) 842-3871
FAX:  (662) 842-8450
jhill@mitchellmcnutt.com

POST OFFICE BOX 1366
215 FIFTH STREET NORTH
COLUMBUS, MS  39701
TELEPHONE: (662) 328-2315
FAX:  (662) 328-8035
bhuskison@mitchellmcnutt.com

2154117

CERTIFICATE OF SERVICE

I, John S. Hill, certify that on this date I electronically filed the foregoing Memorandum Brief in Support of Summary Judgment Motion of the City of Tupelo, Mississippi, Mayor Jason Shelton, in his Official Capacity and Chief Bart Aguirre in his Official Capacity with the Clerk of the Court using the ECF system which sent notification of such filing to Carlos E. Moore, Esq., at his electronic address of carlos@tuckermoorelaw.com, Jason D. Herring, Esq. at his electronic address of jason@jherringlaw.com, Charles T. Tucker, Esq. at his electronic address of charles@tuckerlawgroupllp.com, Michael S. Carr, Esq. at his electronic address of mcarr@carrlawpllc.com and Michael S. Chapman, Esq. at his electronic address of michael@herringchapmanlaw.com.

DATED: August 18, 2017.


/s/John S. Hill
JOHN S. HILL

2154117