**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

PEGGY SHUMPERT, INDIVIDUALLY, AND AS
ADMINISTRATOR OF THE ESTATE OF ANTWUN
SHUMPERT, SR., AND ON BEHALF OF THE HEIRS
AND WRONGFUL DEATH BENEFICIARIES OF ANTWUN
"RONNIE" SHUMPERT, SR., DECEASED,
THE ESTATE OF ANTWUN SHUMPERT, SR.,
AND CHARLES FOSTER                                                                    PLAINTIFFS

V.                                                            CAUSE NO.: 1:16cv120-SA-DAS

CITY OF TUPELO, MISSISSIPPI,
MAYOR JASON SHELTON, IN HIS OFFICIAL
CAPACITY, CHIEF BART AGUIRRE, IN HIS
OFFICIAL CAPACITY, OFFICER TYLER COOK,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
AND "JOHN DOES 1-10", ALL IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITIES                                DEFENDANTS

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' RESPONSE TO**
**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CITY OF TUPELO,**
**MAYOR JASON SHELTON, AND CHIEF BART AGUIRRE**

**COMES NOW** the Plaintiffs, Peggy Shumpert, Individually, and as Administrator of

The Estate of Antwun Shumpert, Sr., and on Behalf of The Heirs and Wrongful Death

Beneficiaries of Antwun "Ronnie" Shumpert, Sr., Deceased, The Estate of Antwun Shumpert,

Sr., [collectively hereinafter "Shumpert"] and Charles Foster [hereinafter "Foster"] and files this

their Memorandum of Authorities in Support of their Response to the Motion for Summary

Judgment filed by City of Tupelo, Mayor Jason Shelton, and Chief Bart Aguirre [hereinafter

"City Defendants"] by and through the undersigned Counsel and would state unto the Court as

follows:

## INTRODUCTION

Shumpert was shot to death on June 18, 2016 by Tupelo Police Department Officer Tyler Cook after being attacked by a police dog. Foster was detained for 5-6 hours and endured multiple humiliating and unnecessary searches without officers having any type of reasonable suspicion or probable cause. A jury question arises regarding whether the City's policies and customs caused a violation of Plaintiffs' constitutional rights. A jury must be allowed to determine whether a direct causal connection exists between City of Tupelo policy and the alleged constitutional deprivation of the rights of Shumpert and Foster.

## STATEMENT OF FACTS

On the evening of June 18, 2016, the Tupelo Special Operations Unit was conducting surveillance on the Townhouse Motel due to complaints of drug activity. TPD Officer Senter observed a vehicle with no working tag light who failed to use a turn signal. Senter initiated a traffic stop. The driver of the vehicle, eventually determined to be Shumpert, ran out of the vehicle and into a neighborhood near Harrison St. The passenger, Foster, stayed at the car. Senter gave chase, identifying the suspect as having a maroon jersey with a No 5 on it and shorts. Cook was in the area with his K9, Alec. Cook, acting alone, observed a house in the neighborhood with a conventional crawl space underneath where Cook noticed a hand trying to hold the door shut. Instead of waiting for backup, setting up a perimeter, or calling for backup, Cook opened the door and found the suspect hiding under the house. He announced "Tupelo PD, come out from under the house and show me your hands, I have a dog and he will bite." Cook then reports that the suspect tried to flee further under the house. Cook then sent in the K9 with the bite command. The K9 bit the suspect, and suspect came out of his jersey and exited from under the house and allegedly tackled Cook. Shumpert had no weapon. Cook then alleges that the suspect was on top of him and punching him, and that Cook had no choice but to shoot the

suspect 3-4 times.  Shumpert, ultimately died from his wounds.  Cook was treated at the hospital for bruising to his face.  All shots were to the front of Shumpert's body.  The state pathologist has identified 4 gunshot entry wounds to Shumpert's body – three to the chest (close range) and one to the groin (distant).[1]  Plaintiffs have produced an affidavit of Titus Smith recounting what was told to him by an eyewitness which is in contrast to Defendant Cook's version of events – in addition to contrasting physical evidence.

Foster, after having heard his friend get shot, was detained for 5-6 hours.  He endured multiple searches of his car and person, including an unnecessary and humiliating strip search, cavity search, and being chained to a wall.  Foster was then released with no charges and had to walk home.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 448 (1986)). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party succeeds, the onus shifts to "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' and designate 'specific facts showing that there is a genuine issue for trial.'"

---

[1] Exhibit 1- Pathology report of Dr. Marc LeVaughn at Bates #T00068-T00073

3

*Id.* at 324. The Court must "draw all reasonable inferences in favor of the nonmoving party" and "refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343 (citation and internal quotation marks omitted).

A non-moving party can defeat a motion for summary judgment by demonstrating that evidence tendered by the moving party is itself laced with contradictions. *International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257 (1991), *Fed. R. Civ. P. 56*.

## ARGUMENT AND AUTHORITIES

Title 42, United States Code § 1983 provides a private cause of action against those who, under color of state law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws" 42 U.S.C § 1983. Municipalities and other bodies of local government are "persons" within the meaning of § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Generally municipalities or local government units are not liable for the constitutional torts of their employees unless those employees act pursuant to an official action or with approval. *Monell*, 436 U.S. at 663 n.7. "A municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. "[U]nder § 1983, local governments are responsible only for `their own illegal acts.'" to establish liability. *Piotrowski v. City of Houston*, 237 F.3d 567, 578-580 (5th Cir. 2001).

## I.  Whether failure to train Cook caused Shumpert's injury

In order to prove his case against the City of Tupelo, Shumpert must identify evidence which shows, first, that an unconstitutional City policy of failure to train police against the use of excessive force existed; second, there was an actual connection between the identified unconstitutional City policy and the City's "policymaker;" and third, Shumpert was subjected to the use of excessive force by City of Tupelo K9 Officer Tyler Cook  ("Defendant Cook"),

because of the execution of the particular City policy identified. *Connick v. Thompson,* ___ U.S. ___ 131 S.Ct. 1350, 1359 (2011); *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.) (*en banc*), cert denied, 472 U.S. 10116 (1985). The City is entitled to insist upon specific identification of the City policy through which the Plaintiff seeks to establish liability. *Piotrowski v. City of Houston*, 237 F.3d 567, 578-580 (5th Cir. 2001).

Plaintiffs maintain that the City of Tupelo failed to adequately train Defendant Cook in the use of force, specifically with the use of the K9 Alec and in dealing with a hostage/barricade situation. While not a direct failure to train in the use of _deadly_ force, this clear failure of Cook to follow TPD Standard Operating Procedures (1) on the use of Alec and (2) in dealing with a hostage/barricade situation directly led to the use of deadly force on Shumpert.

The Constitution provides protections from a municipality's causing a constitutional deprivation. To establish their claim, Plaintiffs must identify evidence that shows not only that an unconstitutional decision was made, but that the City itself made the unconstitutional decision. See *Gonzalez v. City of Ysleta Independent School District*, 996 F.2d 745, 759 (5th Cir. 1993). Plaintiffs have done so by their development of _direct evidence_ that (1) Defendant Cook was not properly qualified to be a K9 handler under TPD policy, (2) that he blatantly violated all protocol, policy, and procedure in dealing with the barricade/hostage situation and (3) City of Tupelo claimed ability to waive standards set forth in their own Standard Operating Procedures, as merely "guidelines" and that the Chief of Police has unilateral "discretion" as to which parts of the Standard Operating Procedure manual he wishes to enforce.

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action [here, training on the use of force in K9 deployment and barricade/hostage situation] has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with `deliberate indifference' as to its known or obvious consequences." *Board*

*of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997), citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "[P]roof of an inadequate policy, without more, is insufficient to meet the threshold requirements of § 1983," *Gonzalez*, 996 F.2d, at 757. "[M]unicipal liability must be predicated upon a showing of `fault,' not merely `responsibility." Id. "[D]eliberate indifference" is a stringent standard of fault, requiring proof that a [governmental] actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. Mere negligence is insufficient to establish a constitutional deprivation. *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995).

Only when a city's failure to train an officer actually causes an injury it may, in certain very limited circumstances, be considered a policy for which a municipality may be held responsible. *Canton*, 489 U.S. at 390. The basis for liability against a city under such circumstances depends upon the degree of fault evidenced by the government's action or inaction. *Brown v. Bryan County*, 219 F.3d 450, 459 (5th Cir. 2000). "To prevail on a failure to train theory a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy and (3) that the inadequate training policy directly caused the violations in question." *Gonzalez*, 996 F.2d at 757.

**A. Whether City of Tupelo's policies and procedures were adequate**

The City of Tupelo has set forth Standard Operating Procedures for the Tupelo Police Department. Each officer is purportedly trained under the rules set forth in those Standard Operating Procedures – relevant to this case – in how to deal with a barricaded suspect/hostage situation as well as the proper manner in which to deploy a K9. Chief Bart Aguirre is Cook's

6

ultimate supervisor. He drafts policy on behalf of the City of Tupelo and reviews it annually.[2] He is ultimately responsible for getting Cook trained.[3] Yet per the Chief,[4] those policies are merely "guidelines" that he can (conveniently) change at his discretion.[5] Plaintiffs take the position that the TPD SOPs, *as written*, appear to be constitutionally adequate. However, the claimed ability of the City of Tupelo policymaker to change them at any time – to fit the circumstances – is unconstitutional. Nowhere in the TPD SOP does it state that the police chief, policymaker, or anyone has the right to arbitrarily change the SOPs at their discretion. This act by City of Tupelo to change the policies to fit the circumstances makes their policies inadequate, and raises a jury question.

### B. Whether City of Tupelo was deliberately indifferent in adopting its training policy

It is clear from the testimony of the City of Tupelo that they were deliberately indifferent in adopting their training policy. They allowed Cook to serve as a K9 officer admittedly without the required training under TPD policy. The qualifications of a canine handler delineated in TPD's Canine Operations policies and procedures require (1) That the officer must have five years uniform patrol experience and (2) That the officer have at least three years' patrol experience with TPD.[6]

Defendant Cook had only been with TPD less than two years when made a canine handler. He was hired on October 7, 2012. He was made a K9 Officer on March 10, 2014.[7] The Incident occurred on June 18, 2016. Cook did not have the five years of uniform patrol experience overall required under the policy nor the required time of patrol experience with TPD. Further,

---

[2] Exhibit 2-Deposition excerpts of Bart Aguirre at P74 L16-25; P75 1-23
[3] Exhibit 2-Deposition excerpts of Bart Aguirre at P46 L18-22
[4] Exhibit 2-Deposition excerpts of Bart Aguirre at P17 L11-13
[5] Exhibit 2-Deposition excerpts of Bart Aguirre at P116 L6-14
[6] Exhibit 3-TPD SOP 5.08 Canine Operations, Bates #T000660
[7] Exhibit 4-City of Tupelo Personnel Action Request Bates #CONF000013

Cook was selected for the K9 position over other officers who had applied and who had more experience.[8]   The City, as a response, merely waives off this failure by calling their policy "guidelines" and that the Chief has "discretion" to make whatever changes he wants.[9]   Per the City, there are "exceptions" to the rules that are admittedly not written down anywhere.[10]   This casual ability to not follow their own written guidelines rises to the level of deliberate indifference.

### C.  Whether the inadequate training policy directly caused the violation in question

Because the City did not follow their own policy and did not adequately train Cook, the question before the Court is whether this inadequate training caused the violation to Shumpert. The answer is a resounding "yes".

TPD policy states that a K9 is only to be called out for assistance in the arrest or prevention of escape of a serious or violent offender.[11]   Chief Aguirre, policymaker for City of Tupelo, testified that this was not the situation.[12]   At no time was Shumpert suspected of having committed a crime of violence prior to him being shot.[13]   Shumpert nor Charles Foster were ever ticketed for any violations from that night.[14]   Officer Cook was not aware of a warrant for Shumpert's arrest at the time he engaged K9 Alec.[15]   Officer Cook admitted he only knew that the crime Shumpert was suspected of was slow rolling a traffic stop.[16]   Cook did not suspect

---

[8] Exhibit 2-Deposition excerpts of Bart Aguirre at P53 L13-24
[9] Exhibit 2-Deposition excerpts of Bart Aguirre at P111 L6-25; P112 L1-9
[10] Exhibit 2-Deposition excerpts of Bart Aguirre at PP112 L7-14
[11] Exhibit 3-TPD SOP 5.08 at B(2) at Bates #T000665
[12] Exhibit 2-Deposition excerpts of Bart Aguirre at P113 L1-8
[13] Exhibit 2-Deposition excerpts of  Bart Aguirre at  P65 L 18-23; P70 L1-6
[14] Exhibit 2-Deposition excerpts of Bart Aguirre at P69 L25
[15] Exhibit 2-Deposition excerpts of Bart Aguirre at P63 L3-7
[16] Exhibit 5-Deposition excerpts of Tyler Cook at P88 L7-14

Shumpert of having committed a violent felony when he first encountered Shumpert under the house.[17] Cook also did not know if anyone was in the house who could be in danger.[18]

### 1. Wait for Backup

Officer Cook did have five to seven officers as backup in the area when he unilaterally sent K9 Alec under the house to attack Shumpert, including two other K9 officers.[19] Cook failed to follow TPD policy in general as he had a duty to wait for a second officer for backup before Cook decided to engage. There is no argument that a second officer was not available.[20] Sgt. Tiffany Gilleylen testified that when she made the scene at most two minutes after the shooting, Officer Merrill and Officer Senter were already present and had handcuffed Shumpert.[21] The fact that these two officers were so nearby is proof that Cook could and should have waited for backup. His failure to follow policy and choice to escalate the situation and engage led to the death of Shumpert.

### 2. Call Supervisor Prior to Deploy K9

Cook admits that he did not call to check in with any supervisor prior to releasing K9 Alec.[22] Further, the policymaker for the City of Tupelo, Chief Aguirre, admits that Officer Cook had five alternative forms to arrest that night (1) Citation (2) Summons (3) Warning (4) Informal Resolution (5) Post Arrest Release.[23] Cook admits he did not even attempt any of these alternative forms to arrest.[24] Most importantly, there was no immediate danger before Cook

---

[17] Exhibit 5-Deposition excerpts of Tyler Cook at P172 L21-24
[18] Exhibit 5-Deposition excerpts of Tyler Cook at P174 L17-19
[19] Exhibit 2-Deposition excerpts of Bart Aguirre at P69 L1-19
[20] Exhibit 2-Deposition excerpts of Bart Aguirre at P93 L5-20; Exhibit 6-TPD SOP 5.04 Patrol Operations Excerpts, Bates #000616
[21] Exhibit 7-Deposition excerpts of Tiffany Gilleylen at P37 L3-13
[22] Exhibit 5- Deposition excerpts of Tyler Cook at P52 L20-23
[23] Exhibit 2-Deposition excerpts of Bart Aguirre at P78 L15-21; Exhibit 8-TPD SOP 3.05 – Arrest Procedures at Bates #T000632
[24] Exhibit 5-Deposition excerpts of Tyler Cook at P202 L1-20

chose to engage. Chief Aguirre admits that at the point where Shumpert was under the house and his hand was visible to Officer Cook, the situation was *stagnate* at that time.[25] After seeing Shumpert's hand holding the door shut, Cook - on his own - chose to escalate from a stagnant situation to an active situation by sending in the dog and engaging Shumpert without backup or a supervisor's permission, which ultimately led to Shumpert's death.

### 3. Barricade Policy - Secure Perimeter with Supervisor and Negotiator

TPD Policy is clear in its subsection styled "Building Searches and Suspects in Hiding" that a building perimeter should be secured by police personnel *prior* to sending in a K9 in a building or structure search.[26] TPD has done this before with K9 officers. In a prior report obtained through discovery, on April 21, 2013 officers responded that they had a black male suspect in a black shirt and dark colored jeans in hiding. TPD officers, *following protocol*, set up a perimeter and then engaged K9 officers to look for the suspect. Officer Cook was present and assisted with that particular arrest.[27] It is imputed through this incident that Officer Cook should have known the protocol requiring the establishment up of a perimeter in a K9 search situation that was stagnant where a suspect was in hiding.

In the instant matter, though Cook and the City of Tupelo deny that Shumpert under the house holding the door shut constituted a "barricaded situation", the City agrees that this situation turns on the definition of barricade.[28] Plaintiffs believe that the proof is abundantly clear that this situation *did* constitute a barricade situation under TPD policy. A genuine issue of material fact exists as to this point which should be decided by a jury. *If* a barricade situation did in fact exist, it would trigger very specific duties of TPD officers, including Cook, per the TPD

---

[25] Exhibit 2-Deposition excerpts of Bart Aguirre at P96 L15-19
[26] Exhibit 3-TPD SOP 5.08(B)(1) Canine Operations at Bates #T000667
[27] Exhibit 9-TPD Incident Report 2013- 2579 at Bates #CONF 000202-000205
[28] Exhibit 10-Deposition excerpts of City of Tupelo at P70 L5-11; L17-25

barricade/hostage policy. A supervisor is required to be noticed during a barricade or hostage situation with the perimeter secured and a negotiator brought in.[29] Cook failed to do any of this. Cook saw Shumpert's hand holding the door shut to the crawl space and chose to engage rather than waiting for backup.[30] Cook admits he did know that the barricade policy required an officer to stop andwait for backup.[31] Cook admittedly did not follow policy because he admittedly did not wait for backup.[32]

### 4. No Urgency to Engage

The Fifth Circuit very recently addressed the quickness of an officer resorting to the use of force in *Trammell v. Fruge*, Case # No. 16-50981 (5th Cir. August 17, 2017). In *Trammell*, the Fifth Circuit denied qualified immunity to officers who gave only three seconds between their initial request for the suspect to place his hand behind his back and when officers tackled the suspect. The Fifth Circuit found that a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required "measured and ascending" actions calibrated to the suspect's conduct. *Poole v. City of Shreveport*, 691 F. 3d 624, 629 (5th Cir. 2012)(quoting *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010)).

Digging a little deeper, the Fifth Circuit has on multiple occasions found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need. See *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer `engaged in very little, if any, negotiation' with the suspect and

---

[29] Exhibit 6-TPD SOP excerpts 5.04 at (C)(4) at Bates #T000616
[30] Exhibit 5-Deposition excerpts of Tyler Cook at P86 L1-10
[31] Exhibit 5-Deposition excerpts of Tyler Cook at P153 L 7-13
[32] Exhibit 5-Deposition excerpts of Tyler Cook at P153 L21-24

`instead quickly resorted to'" force); *Deville v. Marcantel*, 567 F. 3d 156, 168 (5th Cir. 2009)(determining that "[a] reasonable jury could infer from [the plaintiff's] deposition testimony that [the defendant officer] engaged in very little, if any, negotiation with [the plaintiff]—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle").

In the instant matter, though admittedly an argument more along the lines of denial of qualified immunity for Cook, the speed at which Cook reacted is relevant to whether he was properly trained. He did not engage in *any* negotiation with Shumpert before sending in Alec to with the "bite" command. Cook knew he had backup in the area.[33] Cook testified that *has no idea* how much time elapsed between the time that he announced his presence with the dog and the time that he ordered the "bite" command.[34] Cook *did not feel that his life was in danger* when he approached the crawl space and told Alec to "bite".[35] Cook then never gave the release command, and instead grabbed the dog off of Shumpert *after* the shots were fired.[36] In other words, Cook admits he was shooting Shumpert *while the dog was still biting and latched on to Shumpert.*

Supplementing Cook's quick escalation to physical force without any effort to negotiate, Cook did not make *any effort* to secure the building perimeter before deploying the K9, despite five to seven officers close by. When pressed on this failure by Cook to follow policy, Chief Aguirre again took the default position that the Standard Operating Procedures of the Tupelo Police Department are merely "guidelines."[37]

All of the facts above make a clear case that the inadequate training policy caused the

---

[33] Exhibit 5-Deposition excerpts of Tyler Cook at P132 L 24-25; P133 L103
[34] Exhibit 5-Deposition excerpts of Tyler Cook at P91 L25, P92 L1-9; P160 L10-14
[35] Exhibit 5-Deposition excerpts of Tyler Cook at P157 L5-10
[36] Exhibit 5-Deposition excerpts of Tyler Cook at P 92 L4-18; P95 L7-14; P97 L1-6; P98 L14-17
[37] Exhibit 2-Deposition excerpts of Bart Aguirre at P116 L6-14

violation in question. Had Tupelo followed their own protocols, and given the training to Cook which was required by their own policy, with no "discretionary exceptions", then the constitutional violations to Shumpert would not have occurred. A question of fact regarding whether Tupelo's failure to follow policy resulted in injury to Shumpert remains for the jury.

## II. Whether Foster's Search and Detention was a violation of his constitutional rights

The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[38]

For the purposes of the Fourth Amendment, a traffic stop constitutes a seizure of the driver and any passengers in a vehicle. *Brendlin v. California*, 551 U.S. 249, 257-58, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).[7] "An automobile stop is thus subject to the constitutional imperative that it not be `unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996).

"Pursuant to *Terry*, the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)). "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to

---

[38] U.S. Const. amend. I.

stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (emphasis supplied).

In the case currently before this Court, City Defendants allege Officer Senter had probable cause to believe that a traffic violation occurred - in this case - that the vehicle in which Shumpert was driving and in which Foster was a passenger (1) did not have a tag light (2) failed to use a blinker and (3) rolled a stop sign. Charles Foster has submitted an Affidavit stating that the tag light on his car did work properly prior to the car being towed from the scene that night. It was broken after the car was towed.[39] With this conflicting set of facts, it would be improper for this Court to determine, as a matter of law, that the first prong of the two-part test articulated in *Terry* is satisfied – i.e. whether those three allegations of traffic violations are true. This is a jury question.

Concerning prong two of *Terry* – the question arises whether the City of Tupelo had probable cause to continue to detain Foster – particularly since no citations were issued to anyone.[40] The officer did not read Foster his rights. Foster was placed in handcuffs. The officer searched Foster three or four times, as well as searched the car three or four times as well. The the officer put Foster in a police car, and then went back to Foster's car and searched some more.[41] In short, with regard to Charles Foster, City Defendants were merely trying to conduct an impermissibly general criminal investigation.

To add to Foster's personal injury claims, Foster complained that his handcuffs were too tight and that he could not breathe, yet no officer offered to loosen the handcuffs or to provide

---

[39] Exhibit 12-Affidavit of Charles Foster
[40] Exhibit 2-Deposition excerpts of Bart Aguirre at P70 L1-6
[41] Exhibit 11-Deposition excerpts of Charles Foster P37 L14-24

him medical attention. [42] Foster was then taken to the police station, chained to a wall, and strip searched, including an anal cavity search. [43] Foster was incarcerated for 5 or 6 hours and then released with no charges, not even the tag light citation. [44] Multiple questions of fact arise from this scenario: (1) whether the City of Tupelo had reasonable suspicion of criminal activity in the course of the stop on behalf of Charles Foster, (2) whether Charles Foster was denied medical attention; (3) whether it was constitutionally permissible for Charles Foster to be subject to arrest and detention for 5-6 hours and (4) whether it was constitutionally permissible for Charles Foster to be cavity searched without being taken back to general population. *Importantly, the City of Tupelo has produced no policy or testimony regarding the propriety of the search and detention of Foster.* Were these actions constitutional? Were these actions consistent with City policy? All of these questions are properly before a jury.

## III. State Law Claims

Plaintiffs ask that this Court exercise supplemental jurisdiction to determine state law claims. Miss Code Ann §11-46-9(1)(c) provides governmental immunity for a police officer acting within the course and scope of his employment in activities related to police protection unless he acts in reckless disregard. "Reckless disregard" exceeds gross negligence and embraces willful and wanton conduct. *Miss. Dep't of Pub. Safety v. Durn*, 861 So.2d 990, 994-95 (Miss.2003) (quoting *City of Jackson v. Lipsey*, 834 So.2d 687, 691-92 (Miss.2003)). The terms "reckless," "willful," and "wanton" refer to conduct that "is so far from a proper state of mind that it is treated in many respects as if harm was intended." *Maldonado v. Kelly*, 768 So.2d 906, 910 (Miss.2000) (emphasis removed) (quoting *Maye v. Pearl River County*, 758 So.2d 391, 394 (Miss.1999)). "The usual meaning assigned to ... [these] terms is that the actor has intentionally

---

[42] Exhibit 11- Deposition excerpts of Charles Foster P45 L17-20
[43] Exhibit 11- Deposition excerpts of Charles Foster P46 L5-10
[44] Exhibit 11- Deposition excerpts of Charles Foster P47 L16

done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Maldonado*, 768 So.2d at 910 (emphasis removed) (quoting *Maye*, 758 So.2d at 394). Such conduct "usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Maldonado*, 768 So.2d at 910 (quoting *Maye*, 758 So.2d at 394).

### A. State Law Claims - Shumpert

In the instant matter, the parties agree that Cook was acting within the course and scope of his employment. The City has not alleged any specific criminal intent on the part of Cook which would take his actions out of the protections of the Mississippi Tort Claims Act. In short, if Cook is determined to have acted in reckless disregard, then the City, by default, is also exposed to state law claims. A question of fact exists as to whether Cook's actions rise to the level of reckless disregard.

Cook chose to escalate a stagnant situation by disregarding policy and engaging with the suspect. Policy required calling for backup and waiting until backup arrived. Policy required securing a perimeter. Policy required a negotiator. K9 policy required calling a supervisor before deployment. Shumpert was not suspected of being violent. He was not suspected to be armed. He was not suspected to be engaged in a felony. Cook consciously and recklessly disregarded all of this training and education when he actively chose to engage. It was "highly probable" that harm would follow. Shumpert may have been attempting to surrender when he was shot. Cook cannot now claim immunity under state law. Cook cannot and should not have the benefit of being able to toss out all violations of training, policy, and procedure when he escalated this situation - and yet turn around and receive the benefit of immunity. What then is the purpose of a department having Standard Operating Procedures if they can be violated

16

without repercussions?   A question as to what happened is properly before this Court.  Summary judgement on state law claims is properly denied with regard to Shumpert.

### B.  State Law Claims – Foster

Similarly, Foster has put forth evidence that his arrest, detention, and search by TPD officers (not Cook) also rises to the level of reckless disregard.  Foster's testimony is uncontroverted by City Defendants.  The City can point to no policy which would allow or authorize such a detention and search.  The City has elicited no testimony from any witness that the 5-6 hour detention and the strip and cavity search was some type of unwritten and generally accepted "pattern and practice".  City Defendants cannot identify any purpose of the arrest, detention, and search of Foster with this set of facts which would satisfy the discretionary function exemption of Miss. Code Ann §11-46-9(1)(d).     Foster, as an arrestee (with no charges) cannot be considered an "inmate" per the inmate exemption of §11-46-9(1)(m).  Foster's state law claims must go forward.

### CONCLUSION

By weighing the evidence and reaching factual inferences contrary to Plaintiffs competent evidence, this Court must adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.  *Tolan* at 1868.  City Defendants' *Motion for Summary Judgment* should be denied, as a matter of law, and a jury should be afforded the opportunity to determine if the policies and customs of City Defendants caused a violation of Plaintiffs' constitutional rights.  City Defendants' *Motion for Summary Judgment* should be denied, as a matter of law. Genuine issues of material fact exist regarding the aforementioned.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Court deny City Defendants' Motion for Summary Judgment.

RESPECTFULLY SUBMITTED, this the 1st day of September, 2017.

**PEGGY SHUMPERT, ET AL., PLAINTIFFS**

By: ___*/s/ Michael S. Carr*___
Michael S. Carr, MSB No. 102138
Attorney for Plaintiffs

OF COUNSEL:

**CARR LAW FIRM, PLLC**
301 W. Sunflower Rd Suite D
Cleveland, MS, 38732
Phone: (662) 441-1LAW
Fax: 1 (662) 441-1530
Email: mcarr@carrlawpllc.com

**TUCKER|MOORE GROUP, LLP**
**ATTORNEYS & COUNSELORS AT LAW**
306 Branscome Drive
P.O. BOX 1487
GRENADA, MS 38902-1487
662-227-9940 (phone)
662-227-9941 (fax)
Email: carlos@tuckermoorelaw.com

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, do hereby certify that I have this date served via electronic filing system and/or mailed via U.S. Mail, postage pre-paid, a true and correct copy of the above and foregoing to the following:

John S. Hill, Esq.
MITCHELL, McNUTT & SAMS, P.A.
P. O. Box 7120
105 South Front Street
Tupelo, MS 38802-7120
jhill@mitchellmcnutt.com

Jason D. Herring, Esq.
HERRING CHAPMAN, P.A.

342 North Broadway Street
Tupelo, MS 38804
jason@herringchapmanlaw.com

THIS, the 1st day of September, 2017.

/s/ Michael S. Carr
MICHAEL S. CARR, ESQ.